Moncure, P.
I concur in the result of the opinion ■of Judge Anderson, and in most, if not all, of the views presented by him; but as other judges have delivered opinions in these cases differing from that of ■Judge Anderson, it may be proper for me to say something more in explanation of my views of the question involved.
I concur in most of the principles laid down in the opinions of Judges Christian and Staples, which are no doubt fully sustained by the many authorities they have adduced in support of them. I differ from them, only or mainly, in the- application they have made of those principles to these cases.
The question in these cases is, not as to the effect of ■an official act of a judge or other officer dé facto in the course of a peaceful administration of a government ■dejure; or of a judge or other officer, dejure or defacto, in the course of administration of a government de Jacio—such officer claiming authority to act under color of an appointment by such government. In such a case there may 'be, and I think are, good reasons for .giving to the official act of such a person, so far as the public is concerned, all the effect of an official act of an officer de jure of a government de jure.
But the question here is, as to the effect of an official act of a judge or other officer appointed by the military commander of Virginia, while the State was under the military power of congress, such act being done after ■such military power had ceased to exist, and after the new constitution had taken full effect, but before the government was fully organized under the constitution—that is, before there was in existence any agency of the new government authorized to perform such act.
Had the Legislature, convened to organize the gov-ernment under the new constitution, the right to say ■what should be the. legal effect of such an act of such •an officer under such circumstances, and therefore to *90 say that the judgments of the acting Supreme Court of' Appeals, during the period aforesaid, should he so far subject to the supervision and control of the Supreme Court of Appeals organized under the new constitution, as that the latter may grant a rehearing of any of the cases in which such judgments were rendered, provided application should be made therefor within six months after the organization of the said court, and upon twenty days’ notice to the adverse party? In other words: Is that part of the Enabling Act which provides for that object constitutional or not?
That so much of the act as declares all such acts of' such officers valid and binding, with that exception, is not only constitutional, but wise and proper, is admitted on all hands. To that extent, all admit that it is a.wholesome and a healing act.
That so much, also, of that act as provides other agents than those officers to perform, in future, the duties of office until agents could be elected or appointed under the constitution to do so, is constitutional, was. decided by this court in the late cases of Dyer v. Ellyson, and Bell v. Chahoon, and is, therefore, res adjudicata.
And it only remains to enquire, Whether so much of that act as contains the exception aforesaid is constitutional?
It is argued that that portion of the act is unconstitutional, because the judges whose judgments are sought to be reheard were, when they rendered them, at least de facto judges; that the judgments of a de facto judge,, like the acts of any other de facto officer, are as valid and binding as the judgments or acts of a judge or other officer de jure; that, to grant a new trial of a case in which a judgment has been rendered, is a judicial act, which the Legislature has no constitutional power to perform; and that, therefore, the Legislature had no constitutional power to authorize the Supreme Court *91 of Appeals, as now organized, to grant a new trial of a ease decided by the Military Court of Appeals after tine new constitution took effect, and before the present-court was organized.
A great deal has been said—and very forcibly and justly said—about the convenience and necessity of there being always some person to perform the duties of every office necessary to the due administration of the government; and therefore, it is argued, that it was the duty of the incumbents in office, when the new constitution took effect, to continue to perform the duties of their offices until other persons were duly appointed and qualified to take their places.
I admit that it was proper for these incumbents to continue to perform all such duties of office as the public good required to be performed before the appointment and induction of officers under the new constitution; and that it was the duty of the Legislature to confirm their acts if they required confirmation, as was done by the Enabling Act.
But had not the Legislature constitutional power, according to their discretion, to confirm or to disaffirm those acts, or to confirm them sub modo only?
I think they had; whether these officers be regarded as de jure or de facto officers, or as mere usurpers; which I think is perfectly immaterial; unless they were constitutional officers—a question which I will presently notice.
The Legislature, with the exception aforesaid, confirmed those acts, and nobody doubts the propriety of such confirmation.
A power to confirm, seems to involve-, necessarily, a power to disaffirm; or to confirm sub modo only.
So far as the question involved in these cases is concerned, there was a confirmation sub modo. That is, the judgments of these military appointees, rendered after the cessation of the power which appointed them, *92 were confirmed; subject only to a power, given to the Supreme Court of Appeals organized under the new constitution to grant a rehearing by that court, on motion or petition made upon twenty days’ notice to the adverse party, and within six months after the organination or said court.
n0^ ^-is Par^ the act constitutional ? is the only question we now have to decide.'
Whether it be wise or not, whether it would not have been better to have confirmed, unconditionally, all the judgments aforesaid, is not the question we have before us. We may well conceive the motive which induced the Legislature to confirm these judgments as they did, subject to a restricted right of rehearing, as aforesaid. So limited was the sphere of selection of persons to fill the civil offices under the military government, especially during the latter period of its exis. tence, that it was impossible to find persons competent in all eases for that purpose. And the consequence was, that in many cases, probably without the fault of the military commander, civil offices were filled with incumbents wholly unfit and unworthy to fill them. This inconvenience and mischief was seriously felt, especially in regard to judicial offices, which ought to be filled, if possible, with men of the greatest learning and virtue. That some unfit appointments to these offices should have been made, under the circumstances before stated, was naturally to have been expected, and was no doubt unavoidable. Among the offices filled by appointments of the military commander, were the offices of the three judges of which the Supreme Court •of Appeals then consisted. The three judges, thus appointed, entered upon the performance of their offices, and continued to perform them after the military government ceased to exist, down to the period of the organization of the court under the new constitution, except that, at the July term of the court preced *93 ing such, organization, the court declined further to act, in view of the fact that the new constitution had heen adopted by the voters, and was expected soon to be approved by Congress and put into operation, when there would be a Supreme Court of Appeals organized under it; and except, also, that the office of the president of the court was declared by the Legislature to be vacant, in consequence of the fact that the late incumbent of the office, under military appointment, at the same time held an office under the government of the United States. Why this court, after having declined in July further to act as such, because it was probable that the new constitution would soon be approved by Congress and put into operation, yet consented to act, and did act, six months .thereafter, when the new constitution had been so approved and was in operation, and even after the Legislature had been convened, and was actually in session, engaged in organizing the government under that constitution, is a question which I cannot answer, but which, however, is not material to the one we have to decide.
I do not mean to say or insinuate that either of the-three judges of this court, appointed by the military,, was not a competent judge or worthy man, or was influenced by unworthy motives in continuing to act as aforesaid, or that their doing so was an act of impropriety. I will say this much at least, in justice to their capacity, that I have had occasion to examine their opinions in at least one important case, and those opinions seemed to me to be marked by much learning and ability. I have no reason to believe that they were not gentlemen of integrity also, and they may have been well qualified and fitted in every respect for the judicial office. At all events, I doubt not, they were as-well qualified and fitted for that office as any persons who could have been obtained to fill it, under the circumstances.
*94 I state these facts as part of the surrounding circumstances under which the Enabling act was passed. The - doubts and difficulties which induced the passage of that act, and which were intended thereby to be settled, are fully and strongly set forth in its preamble. It confirms all the official acts, otherwise valid, of the incumbents of office when the constitution took effect, which were thereafter performed, except that in regard to judgments of the court of last resort, it gives to the Supreme Court of Appeals, organized under the new constitution, a right of supervision and control as aforesaid. I think this was not an unreasonable precaution and safeguard against injustice, looking to all' the circumstances of the case, supposing the Legislature had power to enact it. Suppose the judges had been incompetent or corrupt, as they might have been for aught the Legislature knew, having been appointed under such unfavorable circumstances. Suppose they had been bribed to render an unjust and illegal judgment. "Was the Legislature to permit that judgment to stand irreversible, as the judgment of a court of last resort, or was it not proper to provide the means of preventing such injustice ?
The Legislature thought it best to adopt the provisos contained in the second section of the act; and I cannot say that they acted unwisely in so doing. But whether they did or not, cannot affect the validity of their act if they had the constitutional power to enact it; and the only question, therefore, is, Had they such power?
The Legislature represents the sovereignty of the State, except so far as they are limited by the constitution. A law enacted by them is presumed to be constitutional until the contrary is plainly made to appear. So much has been said in this case by other judges on this subject, that it is needless to say more. The question, then, is, are the provisos of the second section *95 plainly unconstitutional ? If it be a question of doubt merely, we all agree tbat sucb doubt must be solved in favor of tbe validity of tbe law.
I am of opinion tbat they are not, plainly, unconstitutional.
It is contended tbat they are: 1st, because tbe judges in office when tbe military government ceased to exist, continued in office, under tbe second section of tbe schedule of tbe constitution, until tbe organization of tbe judicial department of tbat constitution. And '2ndly, tbat tbe second section of tbe enabling act, so far as it confers power on tbe Supreme Court of Appeals to be organized under tbe constitution, to supervise and control tbe judgments of tbe Court of Appeals at tbe term thereof commencing on tbe 11th day •of January, 1870, is a judicial act which tbe Legislature is prohibited by tbe constitution to perform.
Hirst. Did tbe judges in office when tbe military .government ceased to exist, continue in office by virtue of tbe second section of tbe schedule, until tbe organisation of tbe judicial department of tbe constitution? If they did, then tbe judgments rendered during tbat period by courts constituted of sucb judges, have tbe same efficacy with judgments rendered by any other constitutional court; and tbe question would arise, whether tbe Legislature bad power to subject tbe judgment of a constitutional Court of Appeals, organized ■or continued under tbe schedule, to tbe supervision and ■control of tbe Supreme Court of Appeals organized under the constitution, both courts being, in tbat view, ■constitutional courts. So far as it may be necessary to notice tbat question, it will be noticed when I come to ■consider tbe second ground of objection above stated.
Tbat tbe powers of all tbe officers of tbe military .government of Virginia ceased to exist when tbat government ceased, may be considered, I suppose, as res ■adjitdicata. Dyer v. Ellyson, and Bell v. Chahoon, ubi *96 supra. After that period, they could only be officers. °f State, if officers at all, and to the extent to which they may be such officers. And they must have de~ r^ve<^ the powers they possessed from the laws of the State, written or unwritten; that is, from the constitution or statutes of the State, or the common law still remaining in force therein.
It is not pretended that they derived any powers fr°m any statufe law as contradistinguished from the constitution. Did they derive any and what powers from the constitution of the State or the common law thereof? b
If they derived any from the constitution, it was only under the second section of the schedule before mentioned; and whether they did or not derive any from that source, is a question I will presently consider I will now consider whether they derived any and what powers from the common law.
I think it very clearly appears, as was shown and held in the cases before cited, and is also fully shown in the opinion of judge Anderson in this case, that the framers of the constitution not only did not provide that the then incumbents of office should continue to perform the duties of their offices until their successors should be appointed and qualified; but, on the contrary, intended to vacate all the offices, leaving them to be filled by the Legislature, or as the Legislature might provide. If this be so, it may be difficult to maintain that the incumbents of office could continue to perform any of the duties of office in virtue of the principles of the common law; which, so far as would be applicable to this question, might seem in that view to be abrogated.
Supposing those principles, in their application to this question, not to have been abrogated, I presume that the utmost extent to which they can go is, to make valid all official acts performed by the military ap *97 pointees, after 'the cessation of the military power, which public necessity or convenience required; subject to such modification as the Legislature might choose to prescribe.
Certainly there were some offices, the duties of which were required by public necessity or convenience to be performed, down to the period of their being filled by persons appointed and qualified under the constitution; and in such cases it was undoubtedly proper for the old incumbents to continue to perform these duties till that period. Whether such necessity or convenience required the three military judges of the Court of Appeals to continue to hold that court and hear and decide causes, after the State had been fully restored to her sovereignty, and when her Legislature was in session, and expected soon to appoint the five judges of that court under the constitution, is at least a very doubtful question, though I do not at all doubt the bona fides of their action in this respect.
But, however that may be, it seems to me most obvious, upon principle, that the official acts of persons thus holding over and acting, after their powers, derived from their original appointments, had ceased, were subject to the will of the sovereignty of the State, and to the supervision and control of the Legislature, which is the representative of that sovereignty, save only to the extent to which it may be restricted by the constitution. These persons were certainly not express agents of the State, even if they could be agents at all, in the face of a manifest intention of the convention that their offices should be vacated. They could at most be but implied agents, from the necessity of the case, and, to the extent of that necessity, subject, of course, to the supervision and control of the Legislature, as before stated, which could, as it did, declare the extent to which their past acts should be effectual, and prescribed the terms on which they, or some of *98 them, might continue to act, until their successors should be appointed and qualified. The period during which any such implied agency could exist, was very brief, being between the time when the constitution took effect and the time when the offices might be filled under the constitution, or the time when they might be temporarily filled earlier by provision of the Legislature.
How, it is not necessary to decide in this case, whether the official acts of these implied agents required express confirmation by the Legislature to make them valid. Perhaps they would have become valid, ab initio, by acquiescence of the State afterwards, and the failure of the Legislature to repudiate them, might have been ■ considered as conclusive evidence of such acquiescence. Or, perhaps, they were valid, ab initio, unless and until expressly disaffirmed by the Legislature at its first session under the constitution.
However this may be, I think the Legislature had power to declare whether it would accept for the State the agency of these military incumbents in performing the' duties of their offices after the military power had ceased, and to what extent, and on what terms such acts should be valid; and, therefore, that it had power to pass the Enabling act, including the provisos of the second section, subjecting the judgments of the military Court of Appeals, after the constitution took effect, to the supervision and control of the Supreme Court of Appeals to be organized under the constitution, unless the military judges were continued in office by the second section of the schedule to the constitution, a question to which I will presently have occasion again to advert, assuming, for the purpose of this branch of my enquiry, that there was no such continuance. The Legislature had power to declare, as it did, in regard to these judgments, that they shall stand, unreversed and irreversible, unless, within six months after the organi *99 zation of the Supreme Court of Appeals, a motion or petition for a rehearing should be made by any party, upon twenty days’ notice to the opposite party, in which case a rehearing may be granted, and such judgment set aside, and annulled or affirmed, as to said Supreme court may seem right and proper.
And now I resume the enquiry, whether, by the second section of the schedule, the three military judges of the Court of Appeals, in office when the constitution took effect, were continued in office until the organization of the judicial department of the constitution.
If they were so continued, it can only be because the court was continued, and because the continuance oí the court necessarily operated a continuance of the judges in office—I say necessarily, because, if such necessity does not exist, the argument is irresistible to show that the framers of the constitution intended to vacate all judicial, as well as other offices of the State, when that instrument took effect. The same argument which applies to other offices, applies with at least equal, if not greater force, to judicial offices. So much has already been said in this opinion, and better said in the opinion of judge Anderson, on this subject, that I will say no more, but will proceed to consider whether the necessary effect of the second section of the schedule was to continue these judges in office.
A court may exist without the existence of & judge of such court. A court does not cease to exist when and because the office of judge of such court is vacated by death, resignation, amotion from office, removal from the State, or otherwise. It was certainly competent for the convention to continue in existence the court, as organized under the old constitution, until the organization of the judicial department under the new constitution, without, at the same time, continuing in office during that period, the judges who were in office when *100 the new constitution took effect. Suppose, for instance, the convention, after saying, as they did, in the 2d -section of the schedule: “The several courts, exceptas herein otherwise provided, shall continue with the like powers and jurisdiction, both in law and in equity, as if this constitution had not been adopted, and until the organization of the judicial department of this constitution,” had added these words: “but the offices of judges of the said courts shall be deemed vacant until filled in the mode prescribed by law,” or “by the old constitution.” Could there be any doubt as to the propriety of these words, and their perfect consistency with the language used before; or as to the power of the convention so to continue the existence of the court? I think not. The Court of Appeals as organized under the old constitution—I mean that of Alexandria—consisted of three judges, any two of whom might hold a court. The Court of Appeals to be organized under the new constitution was to consist of five judges, any three of whom might hold a court. The convention may well have intended, by the language used in the 2d section of the schedule, to continue the organization of the court under the old constitution until the organization of the court under the new constitution, without, at the same time, continuing the existing judges of the court in office, but leaving the vacant offices to be filled, if necessary- or deemed proper, in the mode prescribed by the old constitution, or such other mode as the Legislature might provide. That such was their intention, I think results conclusively from what has already been said. If they had intended to continue the then present judges in office, they would have expressly said so, as did the convention of 1851; notwithstanding that convention expressly continued the existing courts, as did the convention which formed the present constitution. "With that and other like examples before their eyes, the latter convention would *101 not have omitted this express provision of former constitutions for the continuance of the judges in office, if they had intended such continuance; especially, when there were so many other reasons for believing the contrary. But they did not intend it, as is clearly shown, not only by the view just presented, but all the surrounding circumstances.
2dly. The only remaining question is, Whether that part of the Enabling Act I am now considering is a judicial act, which the Legislature is prohibited by the constitution to perform.
I admit that the Legislature cannot perform a judicial act; and the only enquiry is, Whether that part of the act in question is a judicial act ?
If the act had authorized a constitutional court of appeals to grant a rehearing or not, in its discretion, of a case decided by such court at a term which had ended before the passage of the act, it might have been a doubtful question whether it would have been, in that respect, a judicial act.
But it is unnecessary to decide that question, as it does not arise in this case. The court whose decisions were thus subjected to> the supervision' and control of the present Court of Appeals, is the court which was composed of the three military appointees who were in office when the new constitution took effect, and those decisions were rendered after the military power had ceased. I am of opinion that it was not a judicial act to subject those decisions-to the supervision and control of the Supreme Court of Appeals organized under the new constitution, as was'done by the Enabling Act.
How, the only ground on which it can be contended that the Enabling Act, in that respect, was a judicial act, is, that those decisions were, proprio vigore, valid decisions of a court of last resort, which, therefore, could not be set aside or drawn in question after the end of the term at which they were rendered. Were *102 they such decisions, is then the only question; and that' question has already been fully answered. They were- ■ decisions of persons who had no authority whatever to-make them, except what may be derived by implication from the subsequent acts or acquiescence of the State. The only way in which the State ordinarily acts, is by her Legislature, whose power to act for her, in all cases-whatsoever, is restricted only by the constitution. It was in the power of that Legislature to say whether-those decisions should be wholly valid or wholly void; or valid only on certain conditions, and on what conditions. Accordingly, in a very short time after those-decisions were rendered—not longer than a month or two—the Legislature passed the Enabling Act,, whereby it was declared that they should be valid,, unless, within six months after the organization of the judicial department of the new constitution, a rehearing were allowed by the Supreme Court of Appeals, on petition or motion of any party, on twenty days’ notice to the opposite party. The Legislature justly thought that if those decisions,, though rendered under such extraordinary circumstances, were right, they ought to stand; but if wrong, they ought not to stand, if objected to in due time and in a proper manner; and referred the question of right or wrong to the decision of the Supreme Court of Appeals, requiring the objection to be made by petition or motion, upon notice, and within the period aforesaid. In all this there was surely nothing of which the parties in whose favor those decisions were rendered can-have any reason to complain, unless it clearly appears-that some constitutional right was thereby violated. With all deference for the opinions of my brethren who differ with me, I think the contrary appears, and has been shown, if not by me, at least in the full and able opinion of my brother Anderson.
I have said nothing, in terms, about the objection *103 made to the part of the act in question on the ground that it interferes with private property or vested rights; because that objection is embraced in the general one I have just been considering, that the part of the act in question is a judicial act. The only ground on which it can be argued that such part of the act interferes with private property or vested rights is, that the decisions in question are final decisions of the Supreme Appellate Cdurt, which cannot be interfered with after the end of the term at which they were rendered, even by an act of the Legislature. But I think it has been demonstrated that they were not, in themselves, such final decisions.
In conclusion, I am of opinion that the part of the enabling act in question is constitutional. But as a majority of the court think otherwise, it must be declared to be unconstitutional, and the petitions for rehearings in these cases must be denied.
Joynes, J. expressed the opinion orally, that the proviso in § 2 of the enabling act, is unconstitutional.
Motion to rehear refused by a majority of the court.
After the motion to rehear the cases had been overruled, a motion was made to reconsider that motion, and the order overruling the motion was suspended, and time was taken to consider the latter motion. The question was argued in behalf of the motion to rehear the decree, upon printed notes, by Conway Robinson and Lyons.
March 13.